**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 0 1 2006

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ALLTEL COMMUNICATIONS, INC.                                   PLAINTIFF

v.                              Case No. **4 - 06 - CV - 0 0 9 0 9 GH**

FRINDAR MEGASOFT INTERNATIONAL, INC.    This case assigned to District Judge _Howard_
and to Magistrate Judge _Cavaneau_

## COMPLAINT

Alltel Communications, Inc. ("Alltel"), for its complaint against Frindar Megasoft International, Inc. ("Frindar" or "FMI"), states as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter under 28 U.S.C. § 1332. The parties are citizens of different states, and the amount in controversy exceeds $75,000.

2.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this lawsuit occurred in the Eastern District of Arkansas. Moreover, Frindar contractually agreed that any action or proceeding arising out of its agreement with Alltel must be brought in Pulaski County, Arkansas. *See* Master Contractor Agreement, attached as Exhibit 1, at § 40(a).

### THE PARTIES

3.      Alltel is a Delaware corporation with its principal place of business in Little Rock, Arkansas.

4.      Frindar is a Virginia corporation with its principal place of business in Austin, Texas.

## FACTUAL ALLEGATIONS

### The AXN Data Conversion And Migration Project

5.     In October and November 2004, Frindar and Alltel executed a contract titled "Master Contractor Agreement." *See* Master Contractor Agreement, Exhibit 1. The Master Contractor Agreement contemplated that Alltel and Frindar would enter into subsequent, project-specific agreements (*i.e.*, "work orders"). *Id.* at §§ 1-2.  The purpose of the Master Contractor Agreement was to "provide uniform terms and conditions that shall govern the relationship of the parties as [Alltel] and [Frindar] hereafter contract with one another for the performance of certain Project(s)." *Id.* at § 2(a).   The Master Contractor Agreement states that its terms control in the event of a conflict between the terms of the Master Contractor Agreement and a subsequent, project-specific agreement. *Id.* at § 2(b).

6.     The Master Contractor Agreement provides, among other things, that:

- "No payment shall be due [to Frindar] while [Frindar] is in default of any provision of the Master Agreement or any provision of a Work Order covering a specific Project." *Id.* at § 5(e).

- "Prior to performance of work on an hourly basis, [Alltel] shall specify and [Frindar] shall agree upon the number of employees and amount of work and equipment that [Frindar] will provide." *Id.* at § 6(b).

- With respect to contracts involving work to be performed on a "unit basis" (as opposed to work performed on a time-and-expense basis or a lump-sum basis), if "work is requested of [Frindar] for which no unit prices are established in the Work Order, the prices of such work shall either be

2

performed on an hourly basis or through the establishment of additional units in writing, at the option of [Alltel] and agreed upon by [Frindar], prior to performance. *Id.* at § 7(b).

- Changes in work (*i.e.*, alterations of, additions to, or deductions from work contemplated in the project-specific agreement) that affect Alltel's "maximum Work Order price" (*i.e.*, the total amount due to Frindar with respect to a particular project) must be agreed to in writing by the parties "prior to [Frindar's] performing any such change." *Id.* at § 12.

- Alltel may "withhold money due for portions of any defective work which have not been corrected by [Frindar] within a reasonable amount of time to the satisfaction of [Alltel]." *Id.* at § 10(a).

- If Alltel terminates the Master Contractor Agreement or a project-specific agreement, Frindar is entitled to receive payment only for completed work that is "satisfactory." *Id.* at § 35(c).

- Frindar warrants that "all work will be provided in a professional, workmanlike and timely manner free of material defect." Alltel may, at its option, remedy the contractor's defects, and Frindar must pay Alltel's costs and expenses of making such corrections. *Id.* at § 27.

- If Alltel terminates the contract for cause, Frindar is liable for Alltel's "cost and expense of completing the work." *Id.* at § 35(a).

- Frindar must indemnify Alltel for all costs, losses, claims, damages, and causes of action "which may in any manner whatsoever arise out of, result from or relate to this Agreement . . . ." *Id.* at § 32.

7.     In 2005, Alltel decided to move forward with its plan to replace its existing FRAMME databases with Network Engineer, a product designed by Telcordia Technologies, Inc. Alltel wanted to use Network Engineer to track and manage the fiber network that comprises Alltel's Inter-Exchange Network ("AXN"). Network Engineer records and displays fiber facility information, site layout information, contract information, connectivity information, and other data.

8.     Frindar held itself out as a company with the knowledge and skill necessary to perform the task of converting Alltel's existing data and migrating it into Network Engineer.

9.     On February 24, 2005, Alltel and Frindar executed a project-specific agreement, or "Statement of Work." The Statement of Work called for "unit pricing" with respect to most of Frindar's work. For example, Frindar agreed to convert and migrate data pertaining to certain fiber routes at a rate of $10.00 per mile. Alltel agreed to pay to Frindar a fixed fee for developing an initial implementation plan and developing conversion and migration specifications. Alltel did not agree to pay to Frindar an hourly fee for any work contemplated by the Statement of Work.

10.    The Statement of Work stated that Frindar's invoices would be payable only upon Alltel's acceptance of Frindar's deliverables.

11.    Frindar performed (or subcontracted for) work by auditing, converting, and migrating data pursuant to the Statement of Work. Frindar submitted several invoices to Alltel, and Alltel paid many of those invoices.

12.    Much of the data that Frindar delivered was defective and failed to pass objective acceptability criteria established by the parties. Alltel hired Telcordia

4

Professional Services to assist it with deleting and reconverting some of the defective data that Frindar delivered.

13.     Alltel declined to accept much of Frindar's defective work. With respect to other defective work, Alltel offered to make partial payment to Frindar. However, Frindar refused to accept Alltel's offer.

14.     In addition to submitting invoices for defective work, Frindar submitted invoices for tens of thousands of dollars in hourly fees that were allegedly associated with correcting "non-compliant" data, digitizing certain data into Network Engineer, and other tasks. These tasks were within the scope of the Statement of Work. Indeed, Frindar had access to Alltel's FRAMME data before bidding on the conversion/migration project, and Frindar represented that it could competently perform the conversion/migration project. Moreover, even if these tasks were outside the scope of the Statement of Work (and they were not), Alltel did not give written pre-approval for any "change in scope" that would require a departure from the "unit basis" method of compensation. Therefore, Frindar was not entitled to additional compensation on an hourly basis.

15.     In the fall of 2005, Alltel terminated the Statement of Work because of Frindar's inability to perform the conversion/migration project.

16.     Frindar's attorneys have sent demand letters to Alltel with respect to the outstanding invoices that Frindar believes Alltel is obligated to pay. Most recently, Frindar's attorney sent a letter stating that, unless Alltel pays to Frindar the sum of $104,290.18 by July 31, 2006, Frindar will file suit against Alltel.

**Frindar's Factoring Agreement With Allied Capital Partners**

17.     Upon information and belief, on or about February 8, 2005, Frindar entered into a factoring agreement with Allied Capital Partners, LP. Frindar assigned its invoices and accounts receivable to Allied Capital Partners in exchange for operating capital.

18.     On March 31, 2005, Frindar sent a letter to Alltel's accounts payable department.     Frindar explained that it had assigned its "current and future invoices/accounts receivable and all amounts due or to become due thereunder to [Allied Capital Partners, LP]." "Therefore," Frindar instructed, "please note that payments on existing invoice(s) and all future invoices from our company must be made payable and mailed directly to [Applied Capital Partners, LP]." The letter concluded by stating that "[t]his assignment notice will remain in full force and effect until [Allied Capital Partners] notifies you in writing to the contrary."     The letter was signed by representatives of Frindar and Allied Capital Partners. *See* Frindar's assignment notice, attached as Exhibit 2.

19.     Alltel has never received written notification from Allied Capital Partners that Frindar's invoices should no longer be paid directly to Allied Capital Partners.

20.     Alltel mistakenly paid several thousand dollars to Frindar rather than remitting payment on Frindar's invoices to Allied Capital Partners. Under Article 9 of the Uniform Commercial Code, Alltel's payments to Frindar did not discharge Alltel's obligation to Allied Capital Partners. *See* Ark. Code Ann. § 4-9-406(a).

21.     Based on information and belief, Frindar kept Alltel's payments and failed to forward those payments to Allied Capital Partners as Frindar was obligated to do under its contract with Allied Capital Partners.

22.     In September 2005, Frank Henry of Alltel noticed that one of Frindar's invoices indicated that payment should be made to Allied Capital Partners. Mr. Henry sent an e-mail to Jim Frinzi of Frindar and inquired about the language on the invoice. Mr. Henry asked, "[Should] all payments be going to Allied Capital Partners or should they be coming to FMI in Austin?" Mr. Frinzi responded that that, if Alltel's accounts payable department is "really rigid and can have only one address they need to send it to our office." Pursuant to Mr. Frinzi's instructions, Alltel continued to pay Frindar rather than Allied Capital Partners.

23.     Allied Capital Partners threatened to file suit against Alltel in connection with the payments that Alltel made to Frindar. In June 2006, Alltel and Allied Capital Partners settled their dispute regarding the Frindar invoices. Alltel paid $40,000 to Allied Capital Partners under the settlement agreement.

### COUNT I: UNJUST ENRICHMENT/RESTITUTION

24.     Alltel incorporates paragraphs 1 through 23 of this complaint.

25.     Frindar has been, in effect, paid twice for the same work. Frindar received "working capital" from Allied Capital Partners when Frindar assigned its accounts receivable to Allied Capital Partners pursuant to the factoring agreement. Frindar also received payments from Alltel in connection with same accounts receivable that Frindar assigned to Allied Capital Partners. Because Frindar knew that it had assigned its accounts receivable to Allied Capital Partners, Frindar should not have continued to

7

accept payments from Alltel. At the very least, Frindar should have forwarded each of Alltel's payments to Allied Capital Partners rather than keep those payments for itself.

26.     The \$40,000 that Alltel paid to Allied Capital Partners represents the minimum amount that Frindar should have forwarded to Allied Capital Partners rather than keeping.

27.     Frindar has been unjustly enriched by a minimum of \$40,000. Alltel is entitled to restitution in an amount equal to the benefit Frindar received by virtue of Alltel's payments to Allied Capital Partners and Frindar.

## COUNT II: BREACH OF CONTRACT (INDEMNIFICATION)

28.     Alltel incorporates paragraphs 1 through 27 of this complaint.

29.     Under section 32 of the Master Contractor Agreement, Frindar must indemnify Alltel for all costs, losses, claims, damages, and causes of action "which may in any manner whatsoever arise out of, result from or relate to this Agreement . . . ." Allied Capital Partners asserted a "claim" against Alltel with respect to Frindar's invoices. As a result of that claim, Alltel sustained a "loss" in the amount of \$40,000. Alltel's loss "results from" and "relates to" its agreement with Frindar.

30.     Frindar breached the Master Contractor Agreement by failing to indemnify Alltel for its loss.

31.     Alltel has sustained damages as a proximate cause of Frindar's breach.

32.     Frindar is contractually obligated to indemnify Alltel for Alltel's \$40,000 payment to Allied Capital Partners.

## COUNT III: BREACH OF CONTRACT (DEFECTIVE WORK)

33.     Alltel incorporates paragraphs 1 through 32 of this complaint.

8

34.     Frindar failed to perform as warranted when it repeatedly delivered defective data. Frindar's failure constitutes a breach of the Master Contractor Agreement and Statement of Work.

35.     Alltel has sustained damages as a proximate cause of Frindar's breach.

36.     Under the Master Contractor Agreement, Frindar is liable to Alltel for the costs Alltel has incurred in connection with correcting Frindar's defective work and completing the AXN conversion and migration project.

## COUNT IV: FRAUD

37.     Alltel incorporates paragraphs 1 through 36 of this complaint.

38.     On September 19, 2005, James Frinzi, on behalf of Frindar, sent Frank Henry an e-mail stating that Alltel should send payments directly to Frindar's headquarters in Austin.

39.     Mr. Frinzi knew that his statement was false. Specifically, Mr. Frinzi knew that Frindar had assigned its accounts receivable to Allied Capital Partners and that Alltel's payment to Frindar would expose Alltel to liability.

40.     Frindar intended Alltel to rely on Mr. Frinzi's false statement.

41.     Alltel justifiably relied on Mr. Frinzi's misrepresentation by continuing to remit payment on Frindar's invoices to Frindar rather than Allied Capital Partners. In reliance upon Mr. Frinzi's misrepresentation, Alltel paid directly to Frindar in excess of $35,000.

42.     Frindar's misrepresentation caused Alltel to sustain damages. If Alltel had remitted payment on Frindar's invoices to Allied Capital Partners, Alltel would not have had to pay Allied Capital Partners the sum of $40,000.

43.     Frindar's intentional misrepresentation was willful and malicious, entitling Alltel to punitive damages.

### COUNT V: DECLARATORY JUDGMENT

44.     Alltel incorporates paragraphs 1 through 43 of this complaint.

45.     Alltel is not contractually obligated to pay Frindar with respect to Frindar's invoices for unsatisfactory, defective work.  In addition, Frindar's work fell within the scope of the Statement of Work.  Finally, Frindar did not use the contractual change of control process in connection with work that Frindar contends was "out of scope."

46.     Frindar assigned all of its accounts receivable to Allied Capital Partners. Therefore, Frindar is not legally entitled to collect on the invoices that it believes Alltel is obligated to pay.

47.     Frindar intends to sue Alltel for $104,290.18.   A controversy exists regarding interpretation of the pertinent contracts, which requires this Court to review the contracts and determine the rights and duties of the parties.

48.     Alltel requests that this Court issue a declaratory judgment under 28 U.S.C. § 2201 declaring that Alltel has no legal obligation to pay Frindar's outstanding invoices because: (1) Frindar's assignment to Allied Capital Partners extinguished any right that Frindar may have to collect from Alltel; (2) the data that Frindar delivered was defective; (3) Frindar's work fell within the scope of the Statement of Work; and (4) Frindar failed to obtain written pre-approval for any "out of scope" work or otherwise use the contractual change-of-control process.

## DEMAND FOR JURY TRIAL

49.    Alltel demands a trial by jury with respect to its claims for damages.

WHEREFORE, Alltel prays that the Court (1) enter a declaratory judgment under 28 U.S.C. § 2201 finding that Alltel is not obligated under its contract with Frindar to pay any of Frindar's outstanding invoices; (2) enter a declaratory judgment under 28 U.S.C. § 2201 finding that Frindar's assignment to Allied Capital Partners extinguished any right Frindar may have to collect on its outstanding invoices to Alltel; (3) enter a judgment awarding Alltel compensatory damages, punitive damages, attorneys' fees pursuant to Ark. Code Ann. § 16-22-308, costs, pre-judgment interest, a post-judgment interest, and all other relief to which Alltel is entitled.

QUATTLEBAUM, GROOMS,
TULL & BURROW, PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(501) 379-1700

By: _____
Steven W. Quattlebaum (84127)
David A. Curran (2003031)

*Attorneys for Alltel Communications, Inc.*

11

# ALLTEL System

# Master Contractor Agreement

### Issue 11- March 2004

**05-0001**

Contract Number

This Master Contractor Agreement is made and entered into, this

**22nd**   day of   **November**   ,   **2004**

Between

**ALLTEL Communications, Inc.**

Hereinafter called ALLTEL, or the Company, having an address of

**One Allied Drive, Little Rock, AR 72202**

And

**Frindar Megasoft International, Inc.**

Hereinafter called Contractor, having an address of

**9020 N. Capital of Texas HWY, Building 1, Suite 375,
Austin, TX 78759**

### WITNESSETH

WHEREAS, ALLTEL is in the business of furnishing a variety of communications and information processing services to the public and to other firms; and

WHEREAS, ALLTEL desires to expand its business by establishing new locations and facilities throughout the United States;

WHEREAS, Contractor desires to assist ALLTEL in certain of the activities associated with the development of new locations and facilities, that include the engineering, construction and fabrication associated with these locations and facilities, all as may be directed by a Project Agreement or a Purchase Order (as such terms are hereinafter defined) that may be executed hereafter.

NOW THEREFORE, in consideration of the foregoing mutual promises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**EXHIBIT**

1

1.  **Definitions**

The definitions as set forth in this Article shall apply to the following terms when used with initial capital letters in this Master Agreement, any Project Agreement or Purchase Order, and the attachments, Exhibits and amendments thereto.

a)  "Acceptance" shall mean ALLTEL's final approval of a completed Project that is sufficient to cause ALLTEL to execute a Final Acceptance Certificate.

b)  "Affiliate" shall mean, with respect to any person, entity, or enterprise, any other person, entity, or enterprise that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with such person, entity, or enterprise. "Control" (including the correlative terms "Controls", "Controlled by", and "under common Control with") shall mean, with respect to any person, entity, or enterprise, the power, directly or indirectly, either to (i) vote a majority of the voting shares or other voting interests in such person, entity, or enterprise for the election of directors or other governing body of such person, entity, or enterprise or (ii) direct or cause the direction of the management and policies of such person, entity, or enterprise, whether through the ownership of voting securities, by contract, or otherwise..

c)  "Contract Documents" shall mean this Master Agreement, Project Drawings, Specifications and Addenda, Project Agreements, Purchase Orders, or other documents referenced in this Master Agreement, along with any Modifications to a specific Project issued after the execution of this Agreement. These form the Contract Documents and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract Documents represent the entire and integrated agreement between the parties hereto and supersedes prior negotiation, representations or agreements, either written or oral.

d)  "Final Acceptance Certificate" shall mean the form attached to a Project Agreement as Exhibit D and to be executed and delivered by ALLTEL to Contractor upon final completion of a Project.

e)  "Master Agreement" shall mean this Master Contractor Agreement and any Exhibits, attachments and amendments hereto.

f)  "Milestone Date(s)" shall mean the dates agreed to by ALLTEL and Contractor in each Project Agreement or Purchase Order as deadlines for the completion of particular phases of each Project. The Project Agreement may designate installment payments of the Price due on each Milestone Date. Payment and performance terms contained in all subcontracts entered into by Contractor to perform work under a Project Agreement or Purchase Order shall correspond with the Milestone Dates such that no Milestone Date shall occur while a Subcontractor's work relating to such Milestone Date is in progress.

g)  "Partial Acceptance Certificate" shall mean the form attached (when applicable) to a Project Agreement as Exhibit E, which shall be executed and delivered by ALLTEL to Contractor upon completion of phases of a Project or successful completion of work identified by Milestone Dates.

h)  "Price" shall mean the amount due to Contractor under each Project Agreement or Purchase Order for the entire completion of each Project. The Price shall include all reimbursements to Contractor agreed to pursuant to the terms hereof.

i)  "Project" shall mean each undertaking designated by and agreed to by ALLTEL and Contractor under which Contractor shall perform all of the work in substantial compliance with the specifications set forth in each Project Agreement or Purchase Order, including any subsequent changes made to the Project Agreement or Purchase Order agreed to in writing by both parties.

j)  "Project Agreement" shall mean an agreement executed by ALLTEL and Contractor for each individual Project and all ancillary documents included with such Project Agreement. Each Project Agreement shall contain specifications provided by ALLTEL describing the work to be performed to complete the Project.

k)  "Purchase Order" shall mean an agreement by ALLTEL and Contractor for each individual Project under $10,000.00.  Each Purchase Order shall contain specifications provided by ALLTEL describing the work to be performed to complete the Project.

l)  "Project Site" shall mean the geographical location where the work for each Project shall be performed.

m)  "Subcontractor" shall mean a person or entity that has a contract with Contractor to perform a portion of the work required to complete a Project.

## 2.  Scope of Master Agreement

a)  Relationship between Master Agreement and Project Agreement(s) or Purchase Order(s).  This Master Agreement serves to provide uniform terms and conditions that will govern the relationship of the parties as ALLTEL and Contractor hereafter contract with one another for the performance of certain Project(s).

If the parties hereto hereafter desire to contract with one another for the performance of a Project, the parties shall execute a Project Agreement or a Purchase Order (collectively, a "Work Order"), and such Work Order shall become subject to the terms of this Master Agreement.

This Master Agreement, however, in no way binds either party hereto to execute any Work Order, and in the event that no Work Order(s) are executed, this Master Agreement shall have no effect.

b)  Conflict.  In the event there is a conflict between the terms and conditions of this Master Agreement and a Work Order, the terms and conditions of the Master Agreement shall control.

## 3.  Engagement

a)  This Master Agreement serves to provide uniform terms and conditions which will govern the relationship of the parties as ALLTEL and Contractor hereafter contract with one another for the performance of certain projects.

b)  ALLTEL, or an Affiliate of ALLTEL, may from time-to-time issue to Contractor a Work Order describing the Work to be performed for a Project, in accordance with the Contract Documents.  Contractor may accept ALLTEL's Work Order by written acknowledgment or by commencement of the work for the Project as described in the Work Order, and Contractor agrees to perform the work so described in accordance with the Contract Documents upon the terms and conditions as set forth in this Agreement.

c)  The work to be performed by Contractor under this Agreement may sometimes hereinafter be referred to as the "Work".  The Work shall be performed strictly in accordance with the Contract Documents.  Unless otherwise provided in the Work Order, Contractor shall provide and pay for all labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, and whether or not incorporated or to be incorporated in the Work.

d)  ALLTEL and ALLTEL's Affiliates shall not hereby be deemed obligated to issue any Work Order, and this Agreement shall not be deemed an exclusive agreement.  Each party shall be free to enter into any other contracts or agreements, similar or dissimilar, with any other person, entity, or enterprise.

## 4.  Term

Effective Date:              November 22, 2004

Expiration of initial term:   December 31, 2006

The initial term of this Agreement is the period stated above unless otherwise terminated, extended or renewed in accordance with this Agreement.  At the conclusion of the Initial Term, this Agreement may be renewed for an additional two (2) successive one (1) year terms, unless either party provides

the other party with written notice of its intent not to renew this Agreement at least 60 days prior to the expiration of the Initial Term or any renewal term.

## 5.  Responsibilities of ALLTEL

a)  Furnishing Specifications.  ALLTEL shall be responsible for providing specifications to describe each Project, and such specifications shall be incorporated into each Work Order to define the scope of each Project.

b)  Prompt Payment.  Pursuant to the terms of each Work Order, ALLTEL shall issue payment of any undisputed amount promptly as such payments become due and payable, less any retention provided herein.  ALLTEL reserves the right to pay any amounts owed to Subcontractors directly to such Subcontractors, in which case such amounts shall be deducted from any amounts owed to Contractor.  Nothing contained in the preceding sentence shall be construed as:

  i)        limiting the responsibilities of Contractor as to its Subcontractors,

  ii)       creating any responsibilities of ALLTEL as to any Subcontractor, or

  iii)      evidencing any control of any Subcontractor by ALLTEL.

Approval and payment is solely for the purposes of payment and shall not be viewed as approval or acceptance of the workmanship or materials.  Upon project completion and the Company's final inspection and acceptance (which may occur some time after project completion), the Company shall pay the Contractor all amounts which the Contractor is entitled.  Final payment shall be invoiced by the Contractor within forty-five (45) days after the date of completion of the project.

c)  The Company's obligation to make payment is subject to the Contractor having delivered to the Company a release of all liens arising out of this Master Agreement for the work performed and material supplied, or receipts reflecting payment in full of all labor, materials, and equipment for which a lien could be filed for the work performed and material supplied, or in the alternative, a bond satisfactory to the Company indemnifying the Company against such liens.  Contractor shall also secure lien waivers from each Subcontractor who has performed work on the particular phase of the Project and shall deliver a release executed by each such Subcontractor which releases any and all claims against ALLTEL, including any claims against the real property at the location of the Project.

d)  ALLTEL may offset against money otherwise due Contractor for costs of correcting any defective work, or for other sums due ALLTEL under this or any other agreement between the parties.  ALLTEL may hold in reserve from all payments until final payment, an amount equal to 10% of the total due, or such greater amount as may be indicated on the Work Order as retainage.  ALLTEL may withhold such amounts as it deems appropriate to secure performance hereunder, or ALLTEL may, by notice to Contractor, or by listing on the Work Order, require posting of bond, letters of credit, or other such security, at ALLTEL's discretion.  Where a bond or letter of credit is indicated on the Work Order, Contractor shall furnish the required bond or letter of credit to ALLTEL prior to commencement of any Work.

e)  No payment shall be due to Contractor while the Contractor is in default of any provision of the Master Agreement or any provision of a Work Order covering a specific Project.

## 6.  Work On Time and Expense Basis

a)  When work by the Contractor is to be performed on a time and expense basis, payment shall be made by the Company to the Contractor for time actually expended and any reimbursable expenses actually incurred in the work pursuant to Paragraph 5 at the rates set forth in the Work Order - Price Schedules.  Reimbursable expenses are defined to be any expense which the Company has agreed to pay as provided in the Work Order - Price Schedules.

b)  Prior to performance of work on an hourly basis, the Company shall specify and the Contractor shall agree upon the number of employees and amount of work equipment that the Contractor will provide.  When such quantities have been agreed upon by the Company and the Contractor, the Contractor shall not increase the quantity without authorization from the Company.

c) All work performed on a time and expense rate basis will be administered in strict accordance with the Contractor's statement of working conditions included in the Work Order - Price Schedules.

## 7. Work On Unit Basis

a) When work by the Contractor is to be performed on a unit basis, payment shall be made by the Company to the Contractor at the rates set forth in the Work Order - Price Schedules and defined in Work Order - Unit Descriptions. The Company may specify any number of combination of units deemed necessary for work to be performed and the Contractor shall be paid on the basis of units completed, pursuant to Paragraph 5.

b) If work is requested of the Contractor for which no unit prices are established in the Work Order, the prices of such work shall either be performed on an hourly basis or through the establishment of additional units in writing, at the option of the Company and agreed upon by the Contractor, prior to performance.

## 8. Work On Lump Sum Basis

If the Contractor will be submitting more than one invoice for work performed on a lump sum basis, the Contractor will submit to the Company;

a) a schedule of costs of the various phases of the work, including quantities, divided to assist the Company in determining the accuracy of the invoices. The schedule will be provided to the Company prior to the first invoice being submitted by the Contractor. The sum of the schedule of costs will be the total Work Order price.

b) a schedule of Milestone Dates for the Project, along with a fixed fee, or a percentage of the total Work Order price that becomes due upon successful completion of work identified to be complete at each Milestone Date.

## 9. Inspection and Acceptance of Project(s)

a) Upon completion of each Project phase, or on each Milestone Date set forth in the Work Order(s), ALLTEL shall have the right to inspect and examine the work required to be completed on each Project as of the phase or Milestone Date. In the event ALLTEL reasonably finds the work to be in compliance with the specifications of the Work Order, ALLTEL shall sign and deliver a Partial Acceptance Certificate relating to work completed as of the phase or Milestone Date; provided that the requisite lien waivers and Releases have been fully executed and presented to ALLTEL. In the event the work does not meet the requisite specifications designated in the Work Order, or in the event Contractor fails to deliver all of the lien Waivers and Releases required, ALLTEL shall notify Contractor that the requirements of the Work Order have not been met.

b) In the event ALLTEL notifies Contractor that the requirements of the Work Order have not been met, or that the requisite lien Waivers and Releases have not been delivered, ALLTEL will withhold the Partial Acceptance Certificate and Contractor shall have ten (10) days in which to meet such requirements and/or deliver such lien waivers and Releases.

c) Upon the final completion of a Project, ALLTEL shall have the right to inspect and examine the work, and if the work has been completed substantially in accordance with the terms of a Work Order, all Subcontractors have been paid, there are no outstanding unsettled liens, and all applicable lien waivers and releases have been delivered to ALLTEL, ALLTEL shall issue a signed Final Acceptance Certificate. The Final Acceptance Certificate shall constitute final acceptance of the Project and a waiver of all claims associated with defective work under the Work Order, except those arising from

  i)     faulty or defective work discovered after the date of the Final Acceptance Certificate;

  ii)    terms of the warranties provided herein and in the Work Order(s) or

  iii)   unsettled liens of Subcontractors appearing after the date of the Final Acceptance Certificate.

**10. Withholding of Payments**

Upon written notice by the Company,

a)  The Company may withhold money due for portions of any defective work which have not been corrected by the Contractor within a reasonable amount of time to the satisfaction of the Company.

b)  The Company may withhold money due for claims that might be the subject of reimbursement to the Company by the Contractor.

c)  If the Company is advised that the Contractor is not promptly paying subcontractors as described below, or if the Company is advised that employees of the Contractor are not being promptly paid, the Company may withhold such money as the Company deems sufficient to ensure that obligations incurred by the Contractor in connection with the work covered by this Master Agreement will be paid in full. The Contractor shall pay each subcontractor within five days of any payment from the Company to the Contractor for and on account of materials furnished or work performed by each subcontractor.

d)  The company may withhold from or offset against money owed to Contractor under this Agreement in amounts equal to claims which might be subject to reimbursement to ALLTEL Communications Products, Inc. by Contractor for materials purchased from ALLTEL Communications Products, Inc.

**11. Right to Audit**

It is understood and agreed that the Company has the right to audit such statements and review all time sheets, vouchers, checks, or other documents used by the Contractor in preparing any statement submitted to the Company covering this work at any time prior to ninety (90) days after completion of any or all work under this Master Agreement.

**12. Changes in Work**

The Company may make changes in the work by altering, adding to, or deducting from the work. No change in the Work Order price shall be made for minor changes not involving extra cost. All adjustments in the maximum Work Order price shall be agreed to in writing by the parties; provided, however, such agreement shall be made prior to Contractor performing any such change. If after notification by the Company of a need for additional manpower and equipment, the Contractor is not able to meet the increased demand within the time required by the Company, the Contractor will not object to the securing of another Contractor(s) by the Company to perform similar work in the area for which the Contractor has been awarded the Work Order.

**13. Materials**

a)  The Contractor agrees all materials required to perform the work, as identified in the Project Agreement, will be purchased through Company's Affiliate, ALLTEL Communications Products, Inc., at such Affiliate's cost. Contractor also understands and agrees that it is not authorized to purchase any materials through ALLTEL Communications Products, Inc. at such Affiliate's cost, except for those materials required to complete the work specified in the Project Agreement. Contractor shall identify any orders for materials to ALLTEL Communications Products, Inc. that are not required to complete the work specified in the Project Agreement and such materials shall be priced at the then current rates charged by ALLTEL Communications Products, Inc.

b)  Contractor shall provide Company an invoice reflecting the materials utilized during the Invoice billing period, and Company shall pay the Contractor the amount for the materials used for work performed pursuant to the Contract Documents. Company shall otherwise pay such invoice in accordance with the terms of Paragraph 5.

c)  The Contractor shall be responsible for the transportation, care and storage of all materials purchased from ALLTEL Communications Products, Inc. in order to comply with Contractor's obligations pursuant to the terms of the Contract Documents. Contractor may have the option, at Company's discretion, and depending on location and availability, to enter into a lease Agreement in Company's then standard form for purposes of storing materials, vehicles and supplies necessary to complete the work under the Contract Documents. If Company so offers and Contractor chooses to enter into such a

lease, Contractor shall execute the written lease agreement provided by Company or one of its Affiliates.

d)   If Contractor chooses not to enter into a lease agreement with the Company or one of its Affiliates or if Contractor is not given the option to enter into such a lease, Contractor shall be responsible for the storage of materials, utility vehicles, and supplies required to perform the work under the Contract.  The Contractor shall pick up and transport such material and equipment from its place of storage to the job site as needed.  Contractor is responsible to order materials as necessary to fulfill its obligations under the Contract.

(e)  Upon termination of the Contract, Company may request Contractor pick up, transport and return to a place of storage designated by Company or ALLTEL Communications Products, Inc. any unused materials Contractor purchased from ALLTEL Communications Products, Inc. at Company's affiliate cost Contractor may invoice Company for such materials as if utilized under this Contract. In the event Contractor does not return such materials in accordance with this paragraph, Contractor may not invoice company for reimbursement under this Paragraph and the contract and Company (or ALLTEL Communications Products, Inc. on behalf of Company) may charge Contractor a non-fundable fee pursuant to Paragraph 35.

(f)   It shall be the duty of the Contractor to inspect all material used in the performance of the work and Contractor shall not use defective material in any work to be performed hereunder.  Questionable materials should be returned to ALLTEL Communications Products, Inc. for inspection and warranty in accordance with ALLTEL Communications Products, Inc. policy.

## 14. Contractor Employees

The Contractor shall employ capable, experienced, reliable and skilled people as required for the classes of work to be performed.  The Company reserves the right to require the removal of any Contractor or Subcontractor employee from the project if, in the judgment of the Company, such removal is necessary to protect the interest of the Company.

## 15. Independent Contractor

It is expressly understood and agreed that the Contractor is an Independent Contractor and that the Company shall not be liable for any of the Contractor's acts or omissions in the performance of the work. The Contractor represents and warrants that all persons it employs to do work for the Company shall be employees of the Contractor exclusively and at no time shall be authorized to act as agents, servants, or employees of the Company.

## 16. Supervision of Project(s)

Contractor shall supervise and direct each Project using Contractor's best skills and attention, and Contractor shall be solely responsible for all construction means, methods, technique, sequences and procedures relating to each Project, and Contractor shall coordinate all portions of each Project under each Work Order.

## 17. Cooperation with other Contractors

Contractor agrees that ALLTEL may award separate contracts to other contractors to perform certain work at a particular Project Site, and Contractor agrees to cooperate with such other contractors. Contractor also agrees to afford separate contractors a reasonable opportunity for the introduction and storage of materials and equipment at the Project Site.  In no event, however shall Contractor be held responsible for the negligence of the separate contractors or any of their subcontractors or employees.

## 18. Time Frame for Work

(This paragraph is applicable only to a Defined Project Contract)

Upon acceptance and approval of this Contract by the Company, and upon issuance to, and acceptance of a Work Order by the Contractor, as defined in Paragraph 5b, the Contractor has the responsibility to meet the start and completion dates of the Project shown in the Work Order, unless

amended thereafter by the Company. All times stated in the Work Order are of the essence in the performance of this Contract.

**19. Notification of Work and Time Frame for Work**

(This paragraph is applicable only to a <u>Blanket Contract</u>)

a) The Contractor shall perform work under this Contract in response to a Work Order issued by the Company, specifying the work to be done in the Project. Such written notification shall be subject to the terms and conditions of this Contract. To the extent the terms of the written notification are in conflict with this Contract, the terms of this Contract shall govern.

b) The Contractor has the responsibility to meet the start and completion dates of all Projects released to the Contractor, as agreed to between the Contractor and the Company, prior to performance, unless amended thereafter by the Company. All times stated in the Work Order are of the essence in the performance of this Contract.

**20. Time Extensions**

The time for completion of the project set forth in the Work Order, shall be extended for a reasonable period of time for a delay due exclusively to causes beyond the control and without the fault of the Contractor, including acts of God, and acts or omissions of the Company with respect to matters for which the Company is solely responsible. Contractor is responsible for requesting any extension in the time for completion of the Project, and fully documenting the justification for said extension. The exact amount of time granted for any extension shall be mutually agreed upon in writing between ALLTEL and the Contractor.

**21. Liquidated Damages**

Should the Contractor fail to complete the project within the time agreed upon, including any Company-approved time extensions, then the Company shall have the right to deduct from and retain liquidated damages out of such moneys which may be due or which may become due and payable to the Contractor. In view of the difficulty of estimating the exactness of damages caused by such delay, the liquidated damages amount shall be the sum listed in the Work Order, for each and every day that such work is delayed in its completion beyond the specified time. If the amount due and to become due from the Company to the Contractor is insufficient to pay in full any such liquidated damages, the Contractor shall pay to the Company the amount necessary to pay such damages in full. The Company shall promptly notify the Contractor in writing of the manner in which the amount retained, deducted, or claimed as liquidated damages were computed.

**22. Time Sheets**

Contractor shall furnish time sheets acceptable to Company of all work done, unless notified by the Company that time sheets are not required. The time sheets shall be signed by the authorized representatives of Company and Contractor, and one copy of the time sheet shall be submitted by the Contractor to Company. The time sheets shall be itemized in billing the Company for work done.

**23. Protection of Persons and Property**

a) <u>Precautions</u>. Contractor shall at all times take reasonable precautions to protect the persons and property of others which may be on or adjacent to the site of performance of Contractor's obligations hereunder from damage, loss, or injury resulting from performance under this Agreement by Contractor or any other party with whom Contractor may have subcontracted. Contractor shall not disturb or displace any protection installed by others. Any property moved or damaged by Contractor during the course of performance of the Work hereunder shall be returned or repaired by Contractor, at Contractor's expense, to ALLTEL's satisfaction.

b) <u>Clean Up</u>. Contractor shall keep the Project Site and surrounding area free from accumulation of waste materials or rubbish. Upon completion of the Project, and prior to final payment, Contractor shall remove from and about the Project Site, all waste materials, rubbish, Contractor's tools, construction equipment, machinery and surplus materials. Contractor shall dispose of all waste materials and rubbish in accordance with all applicable local, state and federal laws, regulations and ordinances.

c) <u>Interruption of Utility Services</u>. Except as otherwise may be provided in the Work Order, all work shall be performed by Contractor without interruption to or interference with any utility services. Contractor shall identify the type and location of all utility services on, under or near the Project Site. Contractor is responsible for all notifications to utility services prior to the commencement of work on the Project Site. Contractor shall indemnify and hold harmless ALLTEL for any interruption of, or damage to, utility services in breach of this Paragraph.

## 24. Use of Explosives

The Contractor will use no explosives in the performance of work under this Master Agreement without prior written approval of the Company.

## 25. Notification of Injury or Damage

The Contractor shall promptly notify the Company of any injury, death, loss or damage to persons, animals or property which is any way related to the work performed under this Master Agreement, even though such occurrence may not have been caused or contributed to by the Contractor, its employees and agents.

## 26. Inspection of Work

The Company may maintain inspectors at the job site. After reasonable notice to the Contractor, to further assure compliance with the plans and specifications and maintain quality of work, the Company may periodically perform operational tests on the project or a portion or portions thereof selected by the Company. Any work rejected by the Company shall be promptly repaired or replaced by the Contractor.

## 27. Defects in Work

The Contractor hereby represents and warrants to Company that all work will be provided in a professional, workmanlike and timely manner free of material defect. In addition to the foregoing, all of the required work shall be performed in accordance with applicable ALLTEL System Practices, ALLTEL standards, and the Contract Documents. The Contractor shall correct at its expense all defects or deficiencies in the work which result from Contractor-furnished material, workmanship, or failure to follow the plans, drawings, or other specifications that are part of the Contract Documents, which are discovered within one year from the date the work is accepted. Acceptance of the work by the Company shall not constitute a waiver of any such defects or deficiencies. The Company, at its option, may remedy such defects and deficiencies and the Contractor shall pay the Company's costs and expenses of making such corrections.

## 28. Laws and Regulations

a) The Contractor shall in addition to all other applicable laws and regulations, comply with the following regulations during the course of all work done for the Company:

   i)        TITLE 23 Highways (Manual on Uniform Traffic Control Devices)

   ii)       TITLE 29 Labor (OSHA)

   iii)      TITLE 40 EPA

   iv)      TITLE 49 Transportation (Federal Motor Carrier Safety Regulations)

       (1) Parts 100-180 (Hazardous Materials)

       (2) Parts 382 & 390-399 USDOT (Federal Highway Administration Safety Regulations)\

   v)       Federal Communications Commission OET Bulletin 6S (Edition 97-01)

   vi)      Other (Identify)

b) The Contractor shall also comply with all federal, state, local, and municipal laws, ordinances and regulations applicable to vehicle and drivers, the performance of the work, the transportation, storage, handling and disposal of all material used in the performance of the work, and give all notices that may

be required.  The Contractor shall obtain a copy of regulations or permit requirements from the proper authority and make all employees aware of these regulations.  The Contractor shall supply all traffic control devices as required by federal and state regulations.

c)  The Contractor agrees to abide by all federal and state laws and regulations relating to privacy, secrecy, confidentiality, and non-disclosure of communications, and agrees not to disclose any Company records, drawings, plans, information, and other data made available to the Contractor.

## 29. Taxes and Licenses

The Contractor shall at its expense:

a)  pay all taxes required by law in connection with this Master Agreement, or any Work Order awarded to Contractor, including sales, use, storage, and similar taxes,

b)  secure all licenses and permits, pay all charges and fees, and give all notices necessary for the due and lawful prosecution of the work and/or furnishing of materials, except those itemized in any specifications or other Master Agreement Addenda or Exhibits as being provided by the Company, and

c)  provide evidence of such at the Company's request.

## 30. OSHA Compliance

a)  The Contractor shall have full responsibility for following all the requirements of the Occupational Safety and Health Act of 1970 ("the Act") any other applicable safety procedures, and other such laws, regulations, customs, and practices as may be applicable for proper completion of work under this Master Agreement, without any recourse to the Company for additional costs or time because of these requirements.  The Contractor agrees that it is familiar with the Act and regulations issued under the Act and all of the other laws, regulations, customs, and practices referred to above.  The Contractor further agrees that the Company is not in a position to create, control, or abate any hazards associated with the work of the Contractor and that the Company is not in a position to identify any hazards associated with the work.  The Contractor further agrees that the Company is relying upon the Contractor to take all reasonable steps necessary to avoid or abate any hazards associated with the work.  In connection therewith, the Contractor will complete and execute the Contractor Safety Checklist included with each Work Order.

b)  The Contractor shall designate at least one responsible member of the Contractor's organization whose duty shall be to ensure that the Act and the regulations issued under the Act and all other laws, regulations, customs, and practices referred to above are followed and that all reasonable steps necessary to avoid or abate any hazards associated with the work are taken.

c)  The Contractor agrees and represents that it has developed and implemented a written safety program that complies with the Act and all regulations issued under the Act and which covers the work to be performed under this Master Agreement.  The Contractor further agrees and represents that its written safety program is enforced.

d)  The Contractor agrees that no unauthorized persons, including representatives of government agencies, shall be allowed to enter the work site without prior approval of the Company.

e)  The Contractor agrees to indemnify the Company for all citations and complaints arising under or connected with the Act and the regulations issued under the Act or any of the other laws, regulations, customs, and practices referred to above.  The Contractor agrees to defend the Company against such citations and complaints at the Company's election and to reimburse the Company for all penalties, fines, costs, and attorneys' fees incurred by the Company as a result of such citations and complaints.

f)  The Contractor agrees to indemnify the Company for all damages, including workers' compensation costs, sustained by the Company as a result of any injury to any of the Company's employees resulting from the negligence, recklessness, or willfulness of the Contractor.

g)  The Contractor further agrees to indemnify and hold the Company harmless from any claims, damages, and complaints made by any employee of the Contractor against the Company based upon or arising out of any injury or illness allegedly suffered by such employee or out of any condition or

hazard associated with such employee's work for the Contractor and/or contact with the Company. Such indemnification includes the duty to pay the Company's attorneys' fees, expert fees, and costs of defense.

h)  If there is a conflict between this provision and any other provision of the Master Agreement, this provision shall govern.

### 31. Insurance

a)  The Contractor shall obtain and maintain, in full force and effect until the completion of the work and operations covered by this Master Agreement, such minimum insurance as will cover the obligations and liabilities of the Contractor, its agents, and its employees which may arise from the operations under this Master Agreement. Insurance shall have limits of :

**i)    Commercial General Liability policy of minimum limits of:**

| | |
|---|---|
| General Aggregate | $ 2,000,000 per occurrence |
| Each Occurrence | $ 2,000,000 per occurrence |

The policy will be endorsed to show above aggregate limits applying to "each" job site and will specifically state coverage applies to all operations conducted by the Contractor, its employees, or agents on behalf of ALLTEL Corporation or subsidiary.

Where the performance of the work involves structural property, underground property, or blasting, the Contractor's Commercial General Liability insurance policy shall provide coverage to the insured for legal liability arising from operations under this Master Agreement for property damage to include environmental liability (1) arising out of blasting, (2) arising out of collapse of, or structural injury to, any building or structure or (3) to underground facilities and utilities.

Other general liability forms are acceptable in lieu of the Commercial General Liability Form; however they are not to be used without written approval from the Company's Risk Management Department.

**ii)   Business Automobile Liability policy with minimum limits of:**

| | |
|---|---|
| Bodily Injury | $ 2,000,000 per accident |
| Property Damage | $ 2,000,000 per accident |
| OR | |
| Combined Single Limit | $ 2,000,000 per accident |

The policy will be issued using symbol "1 - any auto" coverage.

**iii)  Workers Compensation:**

| | |
|---|---|
| Part A - Medical Benefits | Statutory |
| Part B - Employer's Liability | $2,000,000 |

The policy will show the state in which operation on behalf of ALLTEL and/or subsidiary is being conducted. For operations conducted within monopolistic (state fund) states, the Contractor will furnish a certificate of compliance from the appropriate state fund administrator.

**iv)   Errors & Omissions (for professional services):**

| | |
|---|---|
| General Aggregate | $2,000,000 per policy period |
| Each Occurrence | $2,000,000 |

b)  In each and every policy in (i), (ii) and (iv), ALLTEL Corporation and its subsidiaries shall be named an "additional insured" with respect to activities performed an behalf of ALLTEL Corporation and its subsidiaries.

c) Coverage provided by the policies listed in this paragraph will be issued by an insurance company, acceptable to the Company, licensed in the state in which operations on behalf of the Company are to be conducted. It is acceptable to use both primary and excess/umbrella policies to obtain necessary limits.

d) The Contractor will furnish to the Company, a certificate evidencing insurance coverage under sub-paragraphs (i), (ii), (iii) and (iv) of this paragraph. Such certificate shall provide for a thirty day prior notice to the Company of any cancellation or material changes in coverage and shall be signed by a legal representative of the issuing insurance company.

e) The provisions of sub-paragraphs (i), (ii), (iii) and (iv) of this paragraph shall also apply to all subcontractors, and Contractor shall be responsible for their compliance herewith.

### 32. Indemnification

a) The Contractor shall indemnify, defend and hold harmless the Company and its Affiliates and each of their respective officers, directors, agents and employees (collectively referred to herein as the "Company Indemnities") from and against any and all costs, expenses, losses, claims, damages, actions, causes of action of every kind and description whatsoever, including, but not limited to, reasonable attorney's fees and expenses, (collectively, referred to herein as the "Losses") which may in any manner whatsoever arise out of, result from or relate to this Agreement or the performance or non-performance of the work herein contracted, whether such claims, actions or causes of action are alleged to be the results of any act, omission, neglect or misconduct by the Contractor, its Affiliates or any of their respective subcontractors, officers, directors, agents, and employees or any or all of them, regardless of the fact that the work may have been completed and accepted by the Company and the Contractor may have received payment for the work.

b) Without limiting Section 32(a), the Contractor shall indemnify, defend and hold harmless the Company Indemnities from and against any and all Losses arising out of, resulting from or relating to any claim, action or cause of action for death or bodily injury or damage to property suffered by any person, entity or enterprise as result of any act, omission, neglect or misconduct by the Contractor, its Affiliates or any of their respective subcontractors, officers, directors, agents, and employees or any or all of them, regardless of the fact that the work may have been completed and accepted by the Company and the Contractor may have received payment for the work.

c) Without limiting Section 32(a), the Contractor shall indemnify, defend and hold harmless the Company Indemnities from and against any and all Losses arising out of, resulting from or relating to any claim, action or cause of action for infringement or violation of any patent, trademark, service mark, trade secret, know-how or other intellectual property right by any person, entity or enterprise as result of any act, omission, neglect or misconduct by the Contractor, its Affiliates or any of their respective subcontractors, officers, directors, agents, and employees or any or all of them, regardless of the fact that the work may have been completed and accepted by the Company and the Contractor may have received payment for the work.

### 33. Nondiscrimination

Unless exempt under the rules and regulations of the Secretary of Labor or other proper authority, this Master Agreement is subject to applicable laws and executive orders relating to equal opportunity and nondiscrimination in employment. The parties hereto shall not discriminate in their employment practices against any person by reason of race, creed, color, sex or national origin and agree to comply with the provisions of said laws and orders to the extent applicable in the performance of work or furnishing of services, materials, or supplies hereunder.

### 34. Master Agreement Assignment to Subcontractors

The Contractor shall not assign, transfer or subcontract this Master Agreement or any part thereof, or enter into any Master Agreement with any person, firm or corporation for performance of the Contractor's obligation hereunder, or any part of such obligations, without the prior written approval of the Company.

### 35. Termination or Suspension

a)  Termination for Cause.  The Company may interrupt, discontinue or halt work on a Project being performed under this Master Agreement and, without prejudice to any other right or remedy it may have, terminate this Master Agreement and any or all Work Order(s), immediately upon verbal notice followed by a written notice to the Contractor within seven (7) days, if:

    (i)    The Contractor fails to diligently perform the work;

    (ii)    A delay in the work occurs by reason of strike, lockout or operation of law, whether or not the Contractor is excused by reasons of such delay;

    (iii)    The Contractor is brought into bankruptcy proceedings, whether voluntary or involuntary, or makes an assignment for the benefit of its creditors, or is no longer financially responsible;

    (iv)    The Contractor breaches any of the terms of the Master Agreement or Work Order; or

    (v)    The Contractor exposes the Company to liability for damages for personal injury or property damage.

If the Company terminates the Contract under this Paragraph, the Company may take over the materials, tools and appliances purchased from ALLTEL Communications Products, Inc. at Company affiliate cost for use in the work and Company may complete the work under the Contract. Where the Company completes the work under the Contract, the Contractor shall not be entitled to further payments or compensation under the Contract until the work is completed. If the unpaid balance exceeds the cost and expense of completing the work, the excess shall be paid to the Contractor. If such cost and expense shall exceed the unpaid balance, the Contractor shall pay the difference to the Company. The completion of the work by the Company shall not terminate any other obligation of the Contractor under the Contract. The Company or ALLTEL Communications Products, Inc., in such contingency may exercise any rights, claims or demands, to the extent of its interest in materials furnished, which the Contractor has against any third party in connection with the Contract, and Contractor does hereby assign, transfer and set over unto the Company and ALLTEL Communications Products, Inc. all such rights, claims, and demands.

The Contractor understands and agrees that Company's affiliate cost and any terms of purchase and sale from ALLTEL Communications Products, Inc. to be disclosed to Contractor are confidential and all terms of this paragraph shall apply to assure its protection, and also given the nature of the information and the competitive damage that would result to the Company, ALLTEL Communications Products, Inc., and its affiliates if information contained therein is disclosed to any third party, money damages would not be sufficient remedy for any breach of the Contract Addendum by Contractor, its agents or employees, and in addition to all other remedies, the Company shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, and Contractor, its agents and employees further agree to waive any requirement for the securing or posting of any bond in connection with such remedy.

b)  Termination for Convenience.  The Company may terminate this Master Agreement and all Work Orders, or any individual Work Order, at any time without cause by first giving verbal notice of the effective date of termination, followed by written confirmation of said termination date to the Contractor within seven (7) days.

c)  If this Master Agreement and all Work Orders or any individual Work Order is terminated by ALLTEL as provided in this paragraph, Contractor shall be entitled to receive payment for any satisfactory work completed on such Project prior to the effective date of such termination.

d)  Suspension.  If any Project is delayed for any reason, ALLTEL may suspend the term of the Work Order for such project upon ten (10) days prior written notice to Contractor, for a period up to a maximum of three (3) months (the "Suspension Period"). If a Work Order is suspended by ALLTEL as provided in this paragraph, Contractor shall be entitled to receive just and equitable compensation for any satisfactory work completed on such Project prior to the effective date of such suspension.

## 36. Effect Upon Termination or Suspension

Upon any termination or suspension of this Master Agreement as herein provided, Contractor shall:

a) discontinue all services hereunder as of the effective date of such termination or  suspension;

b)  transfer and deliver to ALLTEL, in the manner and at the time directed by ALLTEL, all of  its right, title and interest in and to completed and uncompleted work, supplies, materials and all contracts, subcontracts, guaranties, books, papers, records, plans, specifications, drawings, surveys, schedules, reports and all other property produced as a part of or acquired in connection with the performance of Contractor's obligations under this Master Agreement and the Work Orders; and

c)  in the event of early termination of this Master Agreement, or any Work Order, take all     action necessary to assure an orderly transition between Contractor and such other party as may be retained by ALLTEL to complete the development of the Projects on behalf of ALLTEL, including, without limitation, timely and complete departure from the Project Sites.

## 37. Facilities and Security

To the extent that Contractor may require access to ALLTEL premises, Contractor will comply with ALLTEL security procedures and rules with respect to access to ALLTEL premises and use of facilities.

## 38. Confidentiality and Proprietary Rights

a)  Contractor acknowledges that all information relating to ALLTEL or the project which may be disclosed to or developed by Contractor during the term of this Contractor Agreement, and all reports, documents, manuals, programs, listings, software and other materials, ideas and work product relating to ALLTEL, the project or Contractor's activities hereunder (the "Proprietary Information"), in whatever form and whether or not developed by Contractor, are and will be the sole property of, will be considered works made for hire, and are and will constitute valuable trade secrets of ALLTEL.

b)  Contractor further acknowledges that ALLTEL would neither enter into the Contractor Agreement nor permit the involvement of Contractor in the Project unless ALLTEL were assured that all such Proprietary Information would be held in confidence by the Contractor.   Contractor will hold the Proprietary Information in strictest confidence, will take reasonable security precautions to safeguard the Proprietary Information from theft or access by unauthorized persons, and will not, directly or indirectly, for any reason, disclose or divulge any Proprietary Information to any person other than to ALLTEL and its employees.

c)  If Contractor becomes aware of any unauthorized possession or use of Proprietary Information, he or she will promptly notify ALLTEL, in writing, of the nature of such unauthorized possession or use. Contractor will not utilize or cause or permit to be utilized the Proprietary Information, for his or her own benefit or for the benefit of any person or entity other than ALLTEL.

d)  Notwithstanding the foregoing, Proprietary Information will not include any information that is:  (i) in the public domain at the time of disclosure or (ii) lawfully obtained by a third party.

## 39. Taxes

Contractor further acknowledges that it is responsible for the payment of any and all Local, State and Federal Taxes that may become due as a result of compensation received for services rendered under this Master Agreement.

## 40. Miscellaneous

a) Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Arkansas. The parties hereby agree and submit to the jurisdiction of the federal or state courts located in Pulaski County, Arkansas and agree that any action or proceeding with respect to this Agreement shall be brought only in federal or state court with appropriate subject matter jurisdiction, located in Pulaski County, Arkansas.

b) Effects of Headings.  Headings to articles and paragraphs of this Agreement are to facilitate reference only, and do not form a part of this Agreement, and shall not in any way affect the interpretation hereof.

c) Non-waiver.  No waiver of any provisions of this Agreement and no consent to any default under this Agreement by ALLTEL shall be effective unless the same shall be in writing and signed by or on behalf of ALLTEL. No course of dealing or failure of ALLTEL to strictly enforce any term, right or

condition of this Agreement shall be construed as a waiver of such term, right or condition. Waiver by ALLTEL of any default by Contractor shall not be deemed a waiver of any other default.

d) Notices. Except as otherwise provided in this Agreement, all notices required or permitted to be given hereunder shall be made by certified mail, return receipt requested, or by an overnight mail service having a record of receipt and addressed to the parties as shown in page 1 of this Agreement. Either party may change its address by notice given to the other party in the manner set forth above. All notices shall be effective upon receipt, or upon attempted delivery where proper delivery was refused or rejected.

e) Severability. Should any part of this Agreement for any reason be declared invalid by court order or by order of any regulatory agency, such order shall not affect the validity of any remaining portion, which shall remain in force and effect as if this Agreement had been executed with the invalid portion eliminated, and it is hereby declared the intention of the parties that they would have executed the remaining portion of this Agreement without including any such part or portion which may, for any reason, be declared invalid.

f) Counterparts. This Agreement may be executed in counterparts including facsimile, each of which shall constitute an original agreement, but all of which together shall constitute one and the same instrument. If signed by facsimile, the parties agree to follow with a signed original document.

g) Entire Agreement. This Agreement, along with all Work Orders, including all Exhibits and Addendum's accepted by Contractor during the term of this Agreement or any renewal thereof constitute the entire and only agreement between the parties and supersedes all previous agreements, oral or written, between the parties concerning the Work. The terms of this Agreement shall supersede any printed terms and conditions that may be printed on the reverse side of an ALLTEL System Purchase Order. No modification or amendment of the terms of this Agreement other than as specifically provided herein, shall be effective except through writing executed by both parties.

h) Survival. Any term of this Agreement which by its nature extends beyond expiration or termination of the Agreement, shall remain in effect until fulfilled and shall apply to respective successors and assigns.

i) No Third Party Beneficiary. With the exception of the parties to this Agreement (and their permitted successors and assigns and those persons, entities and enterprises entitled to indemnity hereunder), the parties do not intend to confer, and there shall not exist, any right on the part of any person, entity or enterprise to claim any right, remedy or benefit under this Agreement.

## 41. Limitation of Liability

IN NO EVENT SHALL COMPANY, WHETHER AS A RESULT OF BREACH OF CONTRACT, WARRANTY, TORT (INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE), PATENT INFRINGEMENT, COPYRIGHT INFRINGEMENT OR OTHERWISE, BE LIABLE TO CONRACTOR, FOR INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, FRUSTRATION OF ECONOMIC OR BUSINESS EXPECTATIONS, LOSS OF PROFITS, OR COST OF CAPITAL, OR DOWNTIME COSTS, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  THE PARTIES EXPRESSLY AGREE THAT THE LIMITATIONS ON DAMAGES SET FORTH IN THIS AGREEMENT ARE AGREED ALLOCATIONS OF RISK.

IN WITNESS WHEREOF, the parties have caused this Master Agreement to be signed below by their duly authorized representatives.

| **Frindar Megasoft International, Inc.** | **ALLTEL Communications, Inc.** |
|---|---|
| Contractor Name | Company Name |

BY: _____          BY: _____

James N. Finzi, CEO                  David M. Green, VP Network
Print Name and Title                 Print Name and Title

10-29-04                             11/19/04
Date                                 Date


BY: _____          BY: _____


_____              _____
Print Name and Title                 Print Name and Title

_____              _____
Date                                 Date





EXHIBIT

2

ALLTEL COMMUNICATIONS, INC.
P.O. BOX 3373
LITTLE ROCK, AR 72203

7003 1680 0000 6392 3431

March 31, 2005

In order to accommodate our growth we are experiencing in our business, we have been obtain the services of Allied Capital Partners, L.P., ("ACP") as a source of working capital. The availability of this service will allow us to serve our customers in a more efficient and timely manner. Please be advised that we have assigned all of our current and future invoices/accounts receivable and all amounts due or to become due thereunder to ACP. Therefore, please note that payments on existing invoice(s) and all future invoices from our company must be made payable and mailed directly to:

**Allied Capital Partners, LP**
**P. O. Box 676649**
**Dallas, TX 75267-6649**

This assignment notice, and the payment instructions herein will remain in full force and affect until ACP notifies you in writing to the contrary. Should you have any questions concerning this letter or your billing, please call Amanda Williams of ACP at 972-448-3503.

Sincerely,

Frindar Megasoft International, Inc.                    Allied Capital Partners, LP

By: _____                    By: _____

Title: _____CEO_____                    Title: ____ACCT MNGR____

---

7003 1680 0000 6392 3431

**SENDER: COMPLETE THIS SECTION**

Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
Print your name and address on the reverse so that we can return the card to you.
Attach this card to the back of the mailpiece, or on the front if space permits.

Article Addressed to:

ALLTELL COMMUNICATIONS
PO BOX 3373
LITTLE ROCK, AR 72203
ATTN: ACCOUNTS PAYABLE

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                      □ Agent
                                       □ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?   □ Yes
   If YES, enter delivery address below:        □ No

3. Service Type
   □ Certified Mail    □ Express Mail
   □ Registered        □ Return Receipt for Merchandise
   □ Insured Mail      □ C.O.D.
4. Restricted Delivery? (Extra Fee)    □ Yes

Article Number
(Transfer from service label)    7003 1680 0000 6392 3431

PS Form 3811    Domestic Return Receipt    102595-02-M-1640